UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

CHARLIE LEE FLOYD, # 603580,

                    Petitioner,                Case No. 1:13-cv-1184

v.                                      Honorable Paul L. Maloney

CARMEN PALMER,

                    Respondent.

_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner's thirteen felony convictions arise from a string of criminal offenses

he committed on Thanksgiving Day in 2004.  The Macomb County Circuit Court jury

found petitioner guilty of first-degree criminal sexual conduct (sexual penetration

during the commission of another felony) Mich. Comp. Laws § 750.520b(1)(c), second-

degree criminal sexual conduct (sexual contact during the commission of another felony)

Mich. Comp. Laws § 750.520c(1)(c), breaking and entering a building with intent to

commit a larceny, Mich. Comp. Laws § 750.110, five counts of breaking and entering a

coin operated device, Mich. Comp. Laws § 752.811(a), first-degree home invasion, Mich.

Comp. Laws § 750.110a(2), two counts of assault with intent to do great bodily harm less

than murder, Mich. Comp. Laws § 750.84, felonious assault, Mich. Comp. Laws § 750.82,

and kidnapping, Mich. Comp. Laws § 750.349.  Petitioner is a fourth habitual offender

serving concurrent sentences of ten to fifteen years' imprisonment on his felonious

assault and breaking and entering a coin-operated device convictions and forty to sixty years' imprisonment on all other convictions.  (ECF No. 11-17, PageID.1125-26).

After unsuccessful attempts to overturn his convictions and sentences in state court, petitioner filed his habeas corpus petition.  He seeks federal habeas corpus relief on eleven grounds:

I.      Petitioner was denied his Sixth Amendment right to represent himself.

II.     Petitioner is entitled to resentencing because his sentences of 62 to 85 years' imprisonment[1] violate the Eight Amendment's Cruel and Unusual Punishments Clause.

III.    Petitioner's rights under the Due Process Clause were violated because the prosecutor did not file a notice of intent information charging him as an habitual offender.

IV.     Petitioner was denied his Sixth Amendment right to a speedy trial.

V.      Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel.

VI.     The evidence at trial was insufficient to support the jury's verdict finding petitioner guilty of kidnapping Ms. Belcher.

VII.    Petitioner's Sixth Amendment rights were violated by ineffective assistance of appellate counsel.

VIII.   The evidence at trial was insufficient to support the jury's verdict finding petitioner guilty of breaking and entering a building.

IX.     The trial court violated petitioner's due process rights by requiring

---

[1]Michigan's courts revised and shortened petitioner's sentences.  He is not serving any sentence of "62 to 85" years' imprisonment.  (*See* ECF No. 11-17, PageID.1125-26).

petitioner to appear in leg restraints at trial, alternatively trial counsel was ineffective for failure to object.

X.   The trial court violated petitioner's due process rights by denying a jury request to review testimony.

XI.  Petitioner was denied a fair trial when phone records were introduced into evidence without a proper foundation under Rule 901 of the Michigan Rules of Evidence.[2]

(Amended Petition, ECF No. 5, PageID.64-118).

Respondent argues that the petition should be denied because all grounds raised by petitioner lack merit. (Answer, ECF No. 10). In addition, respondent argues that Grounds III and IV are barred by procedural defaults and petitioner has not established grounds to overcome those defaults. (*Id.* at 6, 43, 45-50, PageID.131, 168, 170-75).

The Court finds that petitioner has not established grounds for federal habeas corpus relief.[3] Petitioner has not shown that the decisions of Michigan's courts rejecting the grounds raised in his amended petition were "contrary to, or an

---

[2]Petitioner's invocation of Michigan's constitution, laws, and evidence rules as grounds for federal habeas corpus relief are ignored herein because federal habeas corpus relief is available "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

[3]This Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Bales v. Bell*, 788 F.3d 568, 573 (6th Cir. 2015); *Scott v. Houk*, 760 F.3d 497, 506 (6th Cir. 2014). The grounds raised by petitioner in this case are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d). The petition will be denied.

## Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011) (*per curiam*); *Renrico v. Lett*, 559 U.S. 766, 773 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). Section 2254(e)(1) states: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by

-4-

clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt v. Titlow*, 134 S. Ct. 10, 16 (2013); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786-87 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on

behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014); *Davis v. Ayala*, 135 S. Ct. at 2198.

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions.  *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.").  "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *Id.*  (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice."  *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).  Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a

state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254 (d)(2) requires that this Court accord the state trial court substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. at 15.

## Proposed Findings of Fact

### A.    District Court Proceedings

Petitioner received a preliminary examination in 41-A District Court for

Macomb County.  On April 21, 2005, Judge Stephen Sierawski bound over petitioner for trial in Macomb County Circuit Court on all charges. (Preliminary Examination, ECF No. 11-2, PageID.324-25).  The prosecution filed a notice of enhanced sentence as an habitual offender under Mich. Comp. Laws § 769.12, based on petitioner's prior felony convictions.  (ECF No. 15-2, PageID.1979; *see also* ECF No. 11-3, PageID.340).

### B.   Circuit Court Proceedings

On the day before trial, petitioner expressed a desire to represent himself. (Hearing Transcript (HT), 6-9, ECF No. 11-3, PageID.332-35).  Judge James Biernat reminded petitioner of the thirteen felony charges that he faced in this case.  (HT, 10-14,  PageID.336-40).  He reminded petitioner that a notice charging him as an habitual offender, 4th felony offense, had been filed.  He summarized the notice as follows:

> Take notice that Defendant was previously convicted of three or more felonies or attempts to commit felonies in that on or about August 29, 1994 he was convicted of the offense of felony escape, second degree, in Birmingham, Alabama.  And on or about July 1st, 1993, he was convicted of the offense of escape, first degree, in Birmingham, Alabama.  And on or about 6-18-92 he was convicted of the offense of escape, second degree, Department of Corrections, Alabama.  Therefore, [defendant] is subject to the penalties provided by MCL 769.12.

(HT, 14, Page ID.340 (quotations omitted); *see also* ECF No. 15-2, PageID.1979).

Judge Biernat informed petitioner that if he was convicted of *any* felony with which

he was charged in this case,[4] the court could sentence him "to up to life imprisonment" under the habitual offender notice.  (HT at 14, PageID.340).

Petitioner acknowledged that Attorney Goldstein was his third court-appointed attorney this matter.  (HT, 15, PageID.341).  Judge Biernat advised petitioner of the dangers of attempting to represent himself.  He also noted that Attorney Goldstein was a skilled and experienced trial attorney.  The court took a recess to provide petitioner an extended opportunity to consider his options.  When Judge Biernat returned and asked petitioner whether he wished to proceed without counsel, petitioner responded that he would "keep Mr. Goldstein."  (HT, 22, PageID.348).  Petitioner then reiterated that he would "keep Mr. Goldstein as counsel" and that he wanted Attorney Goldstein to represent him at trial.  (HT, 23, PageID.349).

On the first day of trial, petitioner made another request to represent himself.  (TT I, 6-7, ECF No. 11-4, PageID.356-57).  Judge Biernat denied the motion.  He found that petitioner was not capable of representing himself and that this motion for self-representation was a delaying tactic:

The Court has reviewed this matter carefully, and the Court in

---

[4]In addition to the thirteen felony charges in this case, petitioner faced four additional felony charges for his actions while he was detained in the Macomb County jail.  "[T]he charges on 2005-1293-FH [were], Count 1, criminal sexual conduct, second degree; Count 2, criminal sexual conduct, second degree; [] Count 3, criminal sexual conduct, second degree[;] . . . and Count 4, criminal sexual conduct, third degree."  (*Id.* at 9-10, PageID.335-36).

reviewing yesterday's answers to inquiries of the Court, given – and given the nature of these proceedings, the scope of these proceedings, the complexity of these proceedings, the complete lack of – of apparent understanding on some of the procedural matters as well as just the – beyond the procedure, the – the Rules of Evidence as well as the defendant's lack of education and familiarity with the proceedings, the Court finds that the – in the interest of the administration of justice and for orderly proceedings to take place in this matter it is imperative that this defendant be represented by counsel.  Otherwise, this is going to be a charade.  The Court will not allow the Defendant to represent himself in this matter.

The Court made a very detailed inquiry yesterday, spent most of the afternoon engaged in conversations relative to this issue – and queried of the, or questioned the Defendant, and at approximately 4:30 yesterday afternoon the Defendant changed his mind, decided that he wanted to be represented by Mr. Goldstein.  And now that the jury is being drawn again or ready to enter the courtroom he has interjected a new opposition or new – new objection to Mr. Goldstein's representation.  It is apparent to the Court that defendant is engaging in delaying tactics that the Court will not – that the Court will not abide with.  This matter is going to go forward.  It's going to go forward with Mr. Goldstein.

* * *

All right.  As to the issue of self-representation, the Court simply wants to make sure that the record is clear that the denial is not only based upon the Defendant's background by way of lack of educational level, lack of experience in the system, remarks made heretofore by the Defendant when – when queried as to the Sanders, I believe it's People versus Sanders, requirements as well as his – his general demeanor and – and assertions, it is clear to the Court that in addition and due to all of the above the Court is -- is not satisfied that acting as his own counsel the Defendant would not disrupt, unduly inconvenience, nor burden the Court and the administration of this Court's business.  For all of those reasons the request has been denied.

(TT I, 7-9, PageID.357-59).

Judge Biernat advised the attorneys regarding how they were to introduce

-10-

themselves to the jury, explaining:  "The reason for that is I don't want the

Defendant to have to stand up and move around since he is in leg irons, and I do not

want the jury to see that."  (TT I, 9, PageID.359).  The remainder of the first day of

trial was devoted to the jury selection process.  (TT I, 9-179, PageID.359-529).

Before jury selection continued on the second day of trial, Judge Biernat

reiterated his reasons for denying petitioner's request for self-representation:

> The court wishes to revisit an issue that it believes should be clarified.
> The court had made a ruling on Mr. Goldstein representing Charlie Lee
> Floyd and has stated its reasons on the record.  When the court did
> that, the court was under the assumption that the record was already
> clear as to certain other aspects of this case that influenced or impacted
> the court's decision not to allow the defendant to proceed in pro se.
>
> However, on reflection, I don't know if that is really clear on the record
> so I will make it clear on the record.  The defendant as everyone knows
> has been charged with some 13 counts and he has been charged in this
> case as a habitual in the fourth, under the fourth habitual fourth
> offender notice.  And those previous convictions that had been cited by
> the prosecution in its notice all involved felony escape in the State of
> Alabama, which allegedly occurred on 8/29/94, 7/1/93, and 6/18/92.
>
> The defendant has also been charged since he has been an inmate at
> the Macomb County Jail with four counts of criminal sexual conduct
> offenses which allegedly occurred at the Macomb County Jail while the
> defendant was incarcerated pending trial on this matter.  As a safety
> precaution, the Macomb County Sheriff has placed the defendant in
> ankle restraints, if you will, or chains, which are not visible to the jury
> but which is a fact in this matter which really makes it impractical for
> the defendant to move from his position at the bench.
>
> And so, in addition to the reasons previously cited, the Court cites the
> impracticality of proceeding pro se under these circumstances given the
> concerns the court has or the administration of this court's business and
> safety concerns as well as the defendant's conditions in terms of
> restraints.

-11-

(ECF No. 11-5,  TT II, 4-5, PageID.534-35).

### C.    Trial Evidence

Petitioner's trial began on March 23, 2006, and it concluded with the jury's

verdict on March 30, 2006, finding petitioner guilty on all charges.  (Trial

Transcripts (TT I to TT V), ECF No. 11-4, 11-5, 11-6, 11-7, 11-8).  AP testified that on

Thanksgiving Day, November 25, 2004, she was working alone as a security guard at

Raybestos.  (TT II, 181, PageID.711).[5]  The Raybestos Building is a commercial

industrial building located in Sterling Heights, Michigan.  The front part of the

building contains offices and the back part is the industrial part.  The building has

two cafeterias.  (TT II, 158, PageID.688).  AP testified that her job involved walking

around the building's perimeter once and hour to secure it and make sure that all

the doors were locked.  She could also go outside to her car and drive around and

check the outside as well.  (TT II, 182, PageID.712).  She testified that when she

made her rounds at about 9:40 a.m., all of the doors of the building were closed and

locked.  (TT II, 182, PageID.712).  All of the vending machines were intact.  (TT II,

183, PageID.713).  After AP finished her rounds, she went to one of the cafeteria

rooms.  The chairs in the cafeteria room are like benches and the tables and chairs

are bolted to the floor.  At about 10:00 a.m., AP was having some breakfast and

---

[5]Respondent has referred to this rape victim by her initials, AP, presumably to
protect her privacy.  As the identity of the victim is not material to any issue in this
habeas review, the Court will do the same.

reading a book.  (TT II, 183-85, PageID.713-15).

AP testified that petitioner burst through the cafeteria door, charged at her, and demanded to know where the money was.  (TT II, 185-86, PageID.715-16). Petitioner quickly backed AP up against a wall.  He held her hands behind her back and pulled down her pants and underwear.  He grabbed the Army boots that AP was wearing, pulled out the laces and used the laces to tie AP's wrists and ankles.  When she struggled and tried to get petitioner to stop, he slammed her face down on a table.  She testified that petitioner penetrated her vagina with his penis.  She described where she felt petitioner's ejaculate touch her.  (TT II, 186-90, PageID.716-20).

Petitioner then shoved AP under the table.  She could see that petitioner had a hammer and that it was on the corner of the table.  AP heard petitioner pounding and shattering vending machines.  She heard change spilling out onto the floor.  (TT II, 190-91, PageID.720-21).

One of the cafeterias contained five vending machines:  two pop machines and three food vending machines.  The food vending machines were pried open, the cash boxes removed, and parts of those machines were scattered about the room.  (TT II, 159, 161 PageID.689, 691).  Police also found a set of black military boots on one of the lunch tables.  The laces had been removed and were found underneath or to the side of the table.  (TT II, 159, PageID.689).  Underwear was also found on the cafeteria floor.  (TT II, 160-61, PageID.690-91).  Two vending machines in the second

cafeteria room had also been broken into and the cash removed (TT II, 174-75, PageID.704-05).  There was evidence of an unsuccessful attempt to break into the pop machine in this cafeteria.  A broken drill bit was found in the side of the locked door of the pop machine.  (TT II, 175, PageID.705).

Petitioner told AP to stay on the ground and face the wall, or he would kill her.  She was able to work her hands and ankles free without petitioner noticing.  (TT II, 190-92, PageID.720-22).  It eventually became quiet and AP heard the sound of a door swinging.  She got up and ran straight for the exit.  She was not wearing any clothes from the waist down.  She saw that petitioner was across the street.  She ran out into the middle of the road and flagged down the first few vehicles that she saw.  Some of these individuals followed petitioner to Constance Belcher's residence, had a brief conversation with Ms. Belcher's neighbor, Adam Scroggins, and then formed a perimeter around Belcher's house and called the police.  Another driver stopped and the police were contacted via a 911 call.  (TT II, 192-200, PageID.722-30).

The jury heard the 911 recording containing AP's report of what petitioner had done to her.  (ECF No. 11-6, TT III, 121-22, PageID.867-68).  The dispatcher testified that she received the 911 call from a woman who was reporting that she had been the victim of a sexual assault.  The address the dispatcher relayed to the police was the Raybestos Building in Sterling Heights.  (TT III, 46-47, PageID.792-93).

AP was taken to receive medical attention.  She had a bruise on her forehead where petitioner had slammed it into the table.  She had abrasions on both wrists

and a bruise on her right inner thigh.  (TT III, 15-18, PageID.761-64).  Rape kit

testing revealed the presence of semen on various swabs.  The DNA on those swabs

matched petitioner's DNA.  (TT III, 74-77, PageID.820-23; ECF No. 11-7, TT IV, 15-

43, PageID.887-915).

Constance Belcher's residence was located only about one-tenth of a mile from

the Raybestos Building.  (TT III, 119, PageID.865).  Ms. Belcher testified that, on

Thanksgiving Day 2004, she was home alone at her residence.  She heard a loud

knock at the side entrance door.  When she started to open the door, petitioner forced

his way inside.  Ms. Belcher screamed, but she was not able to prevent petitioner

from forcing his way into her home.  Petitioner came inside and closed the door

behind him.  He indicated that he needed the keys to Ms. Belcher's truck and needed

her to remain quiet.  Ms. Belcher told petitioner where the keys were and begged

petitioner not to hurt her.  When someone else knocked on the door, petitioner

demanded that Ms. Belcher remain quiet.  Ms. Belcher testified that she thought she

needed to fight for her life, and she screamed.  She did not see what petitioner hit her

with, but she felt a sharp pain on the back of her head.  She screamed again and was

hit again.  (TT III, 79-86, PageID.825-32).

Ms. Belcher's neighbor, Adam Scroggins, heard the pounding on the door of

Belcher's house.  He looked out and saw petitioner force his way into Belcher's home.

Mr. Scroggins went outside and encountered other men in Belcher's yard.  He spoke

with them briefly, then went and kicked open the side door to Belcher's house.

Petitioner came at Adam Scroggins.  Petitioner was wielding a hammer and Mr. Scroggins retreated to a location outside Belcher's home.  (TT IV, 9-15, PageID.881-87).

Ms. Belcher saw petitioner lock the door and then come back towards her with a hammer in his hand.  Petitioner hit Ms. Belcher in the head a third time, but this time she held onto the hammer and would not let go.  She thought that petitioner was going to kill her.  When petitioner stopped for a moment on the bed to catch his breath, Ms. Belcher was able to gain control of the hammer and she tossed it as far as possible under the bed.  For a time petitioner held Ms. Belcher captive in her bedroom and had barricaded the door with a dresser.  Petitioner and Ms. Belcher eventually left that room and went to other parts of the house.  Petitioner used blankets to cover up the windows.  Ms. Belcher waited until petitioner's eyes closed and then she made a break for the front door of her home.  She was able to exit before petitioner could stop her.  She was transported to the hospital for an MRI and stitches for her head wounds.  (TT III, 79-116, PageID.825-62).

A 911 recording of this incident was played for the jury.  (TT III, 121, PageID.867).  The 911 dispatcher testified that she received a second emergency phone call on Thanksgiving Day 2004.  It was from a female who indicated that she had a barricaded gunman on the line and wanted to conference the call to the dispatcher.  (TT III, 47, PageID.793).  The call was transferred, and a male indicated that he was calling from a house and that he had a female with him.  (TT III, 48,

PageID.794).  The male also claimed that he had two babies in the house.  (TT III, 49, PageID.795).  The man refused to come out of the house.  He reported that he had guns and knives and that if anyone tried to come into the house, he would use them.  (TT III, 50-51, PageID.796-97).  This individual also stated that he had been at Raybestos Building and offered an explanation as to why he had been there.  He stated that he went there to break into vending machines to get the money.  (TT III, 51-52, PageID.797-98).  He did not think that there would be anyone at Raybestos.  He stated that he encountered  a female security guard, pulled off her pants and boots and he ended up "doing her."  (TT III, 52, PageID.798).  Petitioner indicated that he left the Raybestos Building, and saw AP come out of the building "butt naked."  (TT III, 53, PageID.799).  Petitioner refused to release the people inside the house.  He refused to let anyone go.  He stated that the woman in the house had bumped her head.  The dispatcher had a very brief opportunity to speak with that female.  (TT III, 53, PageID.799).

Ms. Belcher testified that she had been permitted to speak on the phone for a short time.  (TT III , 92, PageID.838).  She also heard some of petitioner's telephone calls to others.  During one of these calls, petitioner stated:  "[S]he's going to holler rape. . . .  I took off her laces from her boots and I tied her up and I pulled her panties down but she's going to holler rape.  I know she is."  (TT III, 90, PageID.836).

Police had a perimeter surrounding Ms. Belcher's house.  (TT III, 27-28, PageID.773-74).  This included the SWAT team and a hostage negotiator.  (TT III,

59-60, PageID.805-06).  Petitioner refused to release his hostage.  (TT III, 62,

PageID.808).  The SWAT  team ended up having to enter the house in order to

subdue petitioner.  First, they blew off the front door of the home and tossed canisters

of tear gas inside.  When petitioner failed to come out, they made a dynamic entry

into the building.  They used a flash bang stun grenade.  They found petitioner in a

bathroom at the back of the house.  (TT III, 28-29, 67-68, PageID.774-75, 813-14).

The SWAT team removed petitioner from the building.  (TT III at 62-63,

PageID.810-11).  Police recovered petitioner's hammer.  (TT III, 33, PageID.779).

Petitioner elected to testify.  (TT IV, 48-118, PageID.920-90).  He stated that

he had injected himself with cocaine on Thanksgiving morning 2004.  (TT IV, 63,

PageID.935).  He testified that he knew AP, and that early on the date in question,

she had called him on the telephone.  Petitioner claimed that AP made an inquiry

about buying some of his Vicodin pills.  (TT IV, 53-54, PageID.925-26).  Petitioner

testified, "I left home and went down to Mt. Elliott to a house where I normally

purchase cocaine and I found a guy to take me from there out to where [AP] was for

$15."  (TT IV, 55, PageID.927).  Petitioner testified that he was familiar with the

Raybestos Building because he had previously worked there.  (TT IV at 56,

PageID.928).

Petitioner claimed that AP let him into the Raybestos Building.  (TT IV, 57,

PageID.930).  They purportedly waited for a while for AP's boyfriend to arrive with

the money to buy the drugs from petitioner.  (TT IV, 59, PageID.931).  Petitioner

testified that he and AP found a hammer and that they broke into the vending machines together.  (TT IV, 61-62, PageID.933-34).

Petitioner testified that AP had ecstacy pills with her.  (TT IV, 62, PageID.934).  Petitioner testified that AP wanted his Vicodin pills.  He claimed that despite the anticipated arrival of AP's boyfriend, AP agreed to have sex with him in exchange for the Vicodin.  According to petitioner, his cocaine use was killing his sex drive.  He claimed that AP gave him ecstacy to help him with his sex drive problem.  (TT IV, 62-64, PageID.934-36).  Petitioner testified that AP voluntarily initiated their sexual intercourse.  (TT IV, 65, 68-69, PageID.937, 940-41).

Petitioner testified that he went outside to find a place to mark the building to make it look like it had been broken into after AP finished her shift as a security guard.  He testified that he saw AP run out of the Raybestos Building without any pants.  He stated that he really did not understand why she was doing that and he claimed that he ran to an nearby residence because he was mixed up about the entire situation.  (TT IV, 65-69, PageID.937-41).

Petitioner testified that the only time that he had a hammer in his hand was inside the Raybestos plant, and he denied swinging it at Mr. Scroggins.  (TT IV,  70, PageID.942).  He stated that he knocked on the side door of Ms. Belcher's residence.  When she opened the door he offered a story that he ran his car off the road, that somebody was chasing him, and that he wanted to call the police.  When asked whether he forced his way into Ms. Belcher's house, he responded: "She opened the

-19-

door.  She let me in the house to an extent, but once, you know, she changed her

mind after a second, but I was already in the house before she really grasped, you

know what I'm saying, I really – and then once I shut the door behind me[.]"  (TT IV,

72, PageID.944).  Petitioner admitted hitting Ms. Belcher, but claimed that he had

not done so intentionally.  He asserted that Ms. Belcher had attacked him with a

hammer and that he tried to twist it out of her hand.  (TT IV, 76, PageID.948).

Petitioner testified that he did not leave Belcher's house because the police

were outside.  (TT IV, 76, PageID.948).  He denied doing anything to stop Ms.

Belcher from leaving her house.  (TT IV, 77, PageID.949).  He even claimed that he

begged Ms. Belcher to leave the house.  (TT IV, 80, PageID.952).  Petitioner

conceded that it was his voice on the 911 telephone recording, but stated that he did

not recall much of the conversation because he had taken the ecstacy, cocaine, and

morphine that day.  (TT IV, 83-84, PageID.955-56).

Petitioner's version of events was subjected to extensive cross-examination.

(TT IV, 88-117, PageID.960-89).  The cross-examination included brief impeachment

of petitioner's testimony claiming that he had received a phone call from AP at

approximately 7 a.m. on Thanksgiving morning.  (TT IV, 92-97, PageID.964-69).

Petitioner claimed that AP set him up.  (TT IV, 88, PageID.960).  Petitioner conceded

that he lied in order to get into Ms. Belcher's house, but persisted in his claim that he

never prevented her from leaving.  (TT IV, 88, PageID.960).  Petitioner testified that

he quit working at Raybestos on September 30, 2004, and that he knew the

building's layout.  (TT IV, 98, PageID.970).

Petitioner had significant difficulty attempting to reconcile his direct examination testimony with the 911 recording.  He testified on cross-examination that he did not recall telling the dispatch officer that he went to Raybestos to break into the vending machines.  (TT IV, 98, PageID.970).  He testified that he "might have" said to the dispatcher, "I'm not letting nobody out."  (TT IV, 100-01, PageID.972-73).  Petitioner offered an excuse that he was "out of it that day" and "was very confused."  (TT IV, 101, PageID.973; *see also* TT IV, 101-04, PageID.973-76).  Petitioner continued to deny tying up AP.  He conceded that he broke into vending machines at Raybestos, but claimed that AP did it with him.  He denied slamming AP's head on the table.  (TT IV, 107, PageID.979).  Petitioner persisted in his assertion that AP took his penis out of his pants, but then things became fuzzy and he could not recall enough to provide an accurate explanation of what happened.  (TT IV, 109, PageID.981).  Petitioner's memory improved when it came to remembering that AP helped him break into the vending machines.  (TT IV, 109, 112, PageID.981, 984).

After the jury began its deliberations, it made a number of requests.  The court addressed each request, including the request for "court transcripts." Judge Biernat explained that the court did not have a realtime transcript capacity.  The transcripts would not be available until "tomorrow or maybe Monday."  (TT V, 71, PageID.1066).  The judge instructed the jury to on its collective memory in the

interim.  The judge denied the jury's request for phone records because those records were never introduced into evidence.  The jury was instructed to judge the case by the evidence that had been admitted.  (TT V, 68-72, PageID.1062-66).  Later in the day, the jury returned a verdict finding petitioner guilty on all counts.  (TT V, 73-74, PageID.1067-68).

On May 24, 2006, Judge Biernat conducted a sentencing hearing.  (Sentencing Transcript (ST), ECF No. 11-9, PageID.1073-98).  Petitioner was represented by Attorney Goldstein.  Attorney Goldstein advised Judge Biernat that he had read the presentence report and was satisfied that there were no corrections or omissions. Petitioner had been provided with a copy of the presentence report, but he refused to communicate with his attorney.  Petitioner complained that he had only recently been provided with a copy of the report and conceded that he had declined to communicate with his attorney, indicating that it really did not make a difference at this point in time.  When Judge Biernat offered petitioner additional time to review the presentence report and discuss it with his attorney, his response was: "It's don't matter, your Honor, We can just proceed."  (ST, 5-7, PageID.1077-79).  AP and Ms. Belcher gave victim statements.  Both described their ongoing injuries stemming from petitioner's actions and they asked the court to impose the maximum sentence allowed.  (ST, 9-12, PageID.1081-84).  Judge Biernat sentenced petitioner to concurrent prison terms of 62 to eighty years' imprisonment.  (ST, 15-18, PageID.1087-90; *see also* ECF No. 11-24, PageID.1171-73).

### C.     Subsequent Proceedings

Petitioner pursued an appeal where he was represented by Attorney Daniel

Rust.  Petitioner's appellate counsel raised two issues on appeal:

> 1.     Petitioner is entitled to a new trial because the trial court judge denied his request for self-representation.
>
> 2.     Petitioner is entitled to resentencing because several of his convictions were invalid and violated the principles of proportionality.

(Appellant's Brief, Statement of Questions Presented, ECF No. 11-24,

PageID.1181).

Petitioner filed a supplemental brief raising four additional issues:

> 1.     The habitual offender 4th supplement was improper and violated petitioner's due process rights because he lacked the required prior convictions.
>
> 2.     Petitioner's rights to due process and a speedy trial were violated where delays caused witnesses who would have been available to testify on petitioner's behalf and offer exculpatory evidence to be unable to attend trial.
>
> 3.     Petitioner's trial counsel was constitutionally ineffective.
>
> 4.     The evidence at trial was insufficient to support the jury's verdict finding petitioner guilty of kidnapping.

(Standard 4 Supplemental Brief, Statement of Questions Presented, ECF No. 11-24,

Page ID.1209).

On January 15, 2008, the Michigan Court of Appeals issued its decision on

petitioner's direct appeal. The Court of Appeals rejected all petitioner's challenges to

-23-

his convictions.  It remanded the matter for resentencing.  (ECF No. 11-24,

PageID.1161-70).[6]

Petitioner filed an application for leave to appeal in the Michigan Supreme

Court.  (ECF No. 11-25, PageID.1402-57).  Michigan's highest court entered an order

indicating in lieu of granting leave to appeal it was remanding the matter for

resentencing.  (ECF No. 11-25, PageID.1310).  It is not necessary for present

purposes to retrace the procedural path through which petitioner's sentences were

revised.  It is sufficient to note that petitioner is currently in the custody of the

Michigan Department of Corrections as a fourth habitual offender serving

concurrent sentences of ten to fifteen years' imprisonment on his felonious assault

and breaking and entering a coin operated device convictions and forty to sixty

years' imprisonment on all other convictions.  (ECF No. 11-17, PageID.1125-26).

Petitioner filed a motion for relief from judgment in Macomb County Circuit

Court.  On March 21, 2012, Judge Peter Maceroni entered his opinion and order

denying petitioner's motion for relief from judgment.  (ECF No.11-18, PageID.1127-

35).  Judge Maceroni rejected petitioner's claim that there was insufficient evidence

of breaking to support his conviction breaking and entering a building.  (*Id.* at 5-7,

PageID.1331-33).  The judge found no merit in petitioner's argument that his due

---

[6]The Court of Appeals ruled that the trial judge erred in his belief that the
maximum sentence for counts 4-8 and 11 was life imprisonment rather than fifteen
years.  (ECF No. 11-21, PageID.1165).

process rights had been violated when he was shackled.  The jury did not see the restraints.  The restraints had  been necessary because petitioner had been convicted three times of escape from prison.  Further, after being arrested on thirteen felony charges, petitioner had been charged with four additional counts of criminal sexual conduct for incidents while he was incarcerated in the Macomb County jail.  (*Id.* at 7-8, PageID.1133-34).  Judge Maceroni rejected all petitioner's claims of ineffective assistance of counsel.  (*Id.* at 8-9, PageID.1134-35).

On August 8, 2012, petitioner filed an application for leave to appeal in the Michigan Court of Appeals.  (ECF No. 11-28, PageID.1782-1815).  On January 3, 2013, the Court of Appeals denied petitioner's application for leave to appeal because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  On September 3, 2013, the Michigan Supreme Court denied petitioner's application for leave to appeal on the same basis.  (ECF No. 11-29, PageID.1887).

On October 29, 2013, petitioner filed his petition seeking federal habeas corpus relief.  (ECF No. 1).  He filed his amended petition on December 19, 2013. (ECF No. 5).

## Discussion

### I.    Self-Representation

Ground I is petitioner's argument that the trial court judge violated his Sixth Amendment right to represent himself at trial.  (Amended Petition, ECF No. 5, PageID.69-72; Petitioner's Brief at 4-6, ECF No. 2, PageID.16-18; Reply Brief at 12-

17, ECF No. 15, PageID.1936-41).

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense.  U.S. Const. amend. VI.  In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized a corollary constitutional right "to proceed without counsel when [a defendant] voluntarily and intelligently elects to do so." *Id.* at 807.  "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. ...  Although not stated in the Amendment in so many words, the right to self-representation – to make one's own defense personally – is thus necessarily implied by the structure of the Amendment.  The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819-20 (footnote omitted).  "The Sixth Amendment right of self-representation differs from other constitutional rights because it can not be exercised without the concomitant waiver of another fundamental right that is also guaranteed under the Sixth Amendment; the right to counsel." *Pouncy v. Palmer*, No. 16-1137, __ F.3d __, 2017 WL 128092, at *12 (6th Cir. Jan. 13, 2017).

"[A] defendant's decision to represent himself – and thereby waive counsel – must be knowingly and voluntarily made." *Hill*, 792 F.3d at 677 (citing *Faretta*, 422 U.S. at 835).  "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he

should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."[7]  *Faretta*, 422 U.S. at 835.  (citation omitted).

The right to self-representation is not absolute.[8]  *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 161 (2000).  A defendant may forfeit his self-representation right if he does not assert it "in a timely manner."  *Id.* at 162.  "[I]f the right is asserted in an untimely manner, it may be deemed forfeited as a threshold matter."  *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (*en banc*).  "[T]he timeliness determination contemplated by *Faretta* is multifaceted.  Courts consider not only the actual timing of the defendant's request, but also any threat posed to the orderly progression and integrity of the trial by a defendant's dilatory intent[.]"  *United States v. Cunningham*, 564 F. App'x 190, 193 (6th Cir. 2014); *see also Brown v. Palmer*, No. 1:13-cv-976, 2016 WL 4054989, at *8 (W.D. Mich. July 29, 2016).  "[A]

---

[7]The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel."  *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).  Under its supervisory powers, the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in the Bench Book for United States District Judges before accepting a waiver of a right to an attorney.  *See United States v. McDowell*, 814 F.2d 245, 249-50 (6th Cir. 1987).  The federal courts do not possess supervisory powers over Michigan's courts, however.  Further, this type of formal, detailed inquiry is not required by clearly established Supreme Court precedent.  *See Akins v. Easterling*, 648 F.3d 380, 398 n. 9 (6th Cir. 2011).

[8]"The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law."  *McKaskie v. Wiggins*, 465 U.S. 168, 184 (1984) (quoting *Faretta*, 422 U.S. at 834 n. 46).

request to represent oneself is untimely [if it] is merely a tactic to secure delay in the proceeding." *Halder v. Tibals*, 561 F. App'x 454, 463 (6th Cir. 2014).

Here, the Michigan Court of Appeals rejected petitioner's argument that the trial court violated his right to self-representation.  It noted that petitioner had requested to represent himself one day before his trial.  "At that time, the trial court advised him of the extensive charges against him and the possibility that he could be sentenced to life imprisonment if convicted.  The court ascertained that defendant did not have any legal training and had never previously represented himself.  The court also warned defendant of the dangers of self-representation.  After a short recess, defendant withdrew his request and stated that he wished to continue being represented by his appointed counsel."  (Op. at 3,  ECF No. 11-24, PageID.1382).

The Court of Appeals held that the request for self-representation that petitioner made on the first day of trial was merely a delay tactic and that the trial court did not err in denying petitioner's request.  (*See* Op. at 3, PageID.1163).  "As a matter of clearly established law, *Faretta* can only be read to require a court to grant a self-representation request when the request occurs *weeks before trial* not on the morning of trial."  *Jones v. Bell*, 801 F.3d 556, 564 (6th Cir. 2015).  "No Supreme Court case has filled the gap between requests made weeks before trial and the day of trial, so courts have 'leeway' 'in reaching outcomes in case-by-case determinations."  *Id.* (quoting *Harrington*, 562 U.S. at 106).

Petitioner has not demonstrated that the decision of the Michigan Court of Appeals rejecting

-28-

Ground I was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

## II.     Eighth Amendment Challenge to Sentences

In Ground II, petitioner argues that his sentences of "62 to 85" years' imprisonment violated the Eight Amendment's Cruel and Unusual Punishments Clause.  (Amended Petition, ECF No. 5, PageID.74-76; Petitioner's Brief at 7-9, ECF No. 2, PageID.19-21; Reply Brief at 18-22, ECF No. 15, PageID.1942-46).  This claim is moot because petitioner's sentences were revised and he is not currently serving any sentence of 62 to 85 years' imprisonment.

Petitioner's Reply Brief is far from a model of clarity, but he may be claiming that his revised sentences of forty to sixty years' imprisonment are disproportionate.  (Reply Brief at 18-22, ECF No. 15, PageID.1942-46).  To the extent petitioner is arguing that his sentences are disproportionate under *People v. Milbourn,* 461 N.W.2d 1 (Mich. 1990), he fails to raise a cognizable habeas claim.  *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. Apr. 21, 1995).  A federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law.  *See* 28 U.S.C. § 2254(a).  Thus, any claim based on *Milbourn* is not cognizable in a habeas corpus action.

Petitioner's argument that his sentences are disproportionate under the Eighth Amendment is without merit.  Although petitioner's sentences were lengthy, they were not disproportionate to the seriousness of the offender or the circumstances surrounding the crimes that petitioner committed.  (Op. at 4-5, ECF No. 11-24, PageID.1164-65).  The Eighth Amendment does not require strict

-29-

proportionality between a crime and its punishment. *Harmelin v. Michigan*, 501 U.S. 957, 965

(1991); *see Bonilla v. Lafler*, 501 F. App'x 494, 497 (6th Cir. 2012); *see also Lockyer v. Andrade*,

538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the "extraordinary case");

*Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in " 'the rare case in which a

threshold comparison of the crime committed and the sentence imposed leads to an inference of gross

disproportionality' ") (quoting *Harmeline*, 501 U.S. at 1105). A sentence that falls within the

maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"

*Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000); *see also Thomas v. Berghuis*, No. 15-1164,

2015 WL 5313636, at *5 (6th Cir. Sept. 10, 2015); *Hynes v. Birkett*, 526 F. App'x 515, 521-22

(6th Cir. 2013). Petitioner's sentences fall within the maximum penalty under state law. His sentences

therefore do not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel

and unusual punishment. Ground II does not provide a basis for federal habeas corpus relief.

## III.   Due Process Clause Challenge to the Habitual Offender Notice

In Ground III, petitioner challenges the habitual offender notice on due process grounds.

(Amended Petition, ECF No. 5, PageID.78-81; Petitioner's Brief at 10-12, ECF No. 2, PageID.22-

24; Reply Brief at 23-26, ECF No. 15, PageID.1947-50).

The Michigan Court of Appeals rejected petitioner's arguments challenging the enhancement of

his sentences as an habitual offender:

> Defendant contends that his 1980 conviction for robbery should not have been
> considered to enhance his sentence under MCL 769.12 because it occurred more than
> ten years before the instant offenses. In *People v. Zinn*, 217 Mich.App 340, 349; 551
> NW2d 704 (1996), this Court determined that a trial court may constitutionally
> consider convictions that are more than ten years old in determining whether a

-30-

defendant is an habitual offender.

Defendant also contends that his sentence should not have been enhanced under MCL 769.12 because his only previous conviction, other than the 1980 robbery conviction, was his 1992 escape conviction.  Defendant maintains that the 1993 and 1994 escape convictions listed on the habitual offender notice do not exist.  Although defendant's PSIR lists several convictions in addition to the 1980 robbery conviction, it does not list convictions for escape occurring in 1993 or 1994.  Rather, the only escape conviction listed in the PSIR is the one that defendant admits he committed in 1992.  Defendant was advised of the fourth habitual offender notice on the day before trial if not before that date.  In the context of warning defendant about the dangers of self-representation, the trial court advised him that the prosecutor's notice alleged that he had three previous escape convictions.  Thus, defendant's contention that he was unaware until sentencing that he could be sentenced as a fourth habitual offender is simply untrue.

Under MCL 769.13(4), a defendant may challenge the accuracy or validity of one or more prior convictions listed in a notice by filing a written motion.  Even if the 1993 and 1994 escape convictions listed in the notice did not occur, however, defendant has not established plain error affecting his substantial rights.  If he had challenged the accuracy of the habitual offender notice in the trial court, the prosecutor could have amended the notice to include previous convictions other than the contested 1993 and 1994 escape convictions.  *People v. Hornsby*, 251 Mich.App 462, 469-473; 650 NW2d 700 (2002).  Defendant's PSIR lists at least three other convictions that could have supported defendant's sentence enhancement as a fourth habitual offender.  Defendant did not contest the accuracy of his PSIR at sentencing.  Thus, he has failed to establish plain error with respect to his habitual offender fourth sentence enhancement under MCL 769.12.

(Op. at 6, ECF No. 11-24, PageID.1166).

Petitioner has not demonstrated that the decision of the Michigan Court of Appeals rejecting Ground III was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

**IV.   Speedy Trial**

-31-

In Ground IV, petitioner argues that his right to a speedy trial was violated. (Amended Petition, ECF No. 5, PageID.83-84; Petitioner's Brief at 13-14, ECF No. 2, PageID.25-26).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. Amend. VI; *see also Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (holding that the right to a speedy trial is incorporated through the Fourteenth Amendment and thus applies to the states).  "The purpose of the speedy-trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *Brown v. Romanowski*,  No. 15-1823, __ F.3d __, 2017 WL 75785, at *4 (6th Cir. Jan. 9, 2017) (collecting Supreme Court cases).

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court established a four-factor test for evaluating Sixth Amendment speedy-trial claims:  (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.  None of these four factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  *Id.* at 533.

The Michigan Court of Appeals considered all the *Barker* factors and it rejected petitioner's speedy trial claim.  Because the weighing of the *Barker* factors is

-32-

a general rule, the review conducted by a habeas court must be even more deferential. " 'The more general the rule at issue'–and thus the greater the potential for reasoned disagreement among fair-minded judges–'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.' " *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Here, the length of the delay between petitioner's arraignment and the first day of trial was approximately ten months. (Op. at 7, ECF No. 11-24, PageID.1167). Thus, petitioner was not entitled to a presumption of prejudice. *See Brown v. Romanowski*, 2017 WL 75785, at *8. The reason for the delay was a significant factor that weighed heavily against petitioner's speedy trial claim: "seven pretrial conferences were adjourned at [petitioner's] request, trial was adjourned at [petitioner's] request three times, defendant requested new counsel on one occasion, and [petitioner's] replacement counsel moved to withdraw, resulting in the appointment of a third attorney[.]" (Op. at 7, PageID.1167). The delays "were all attributable to [petitioner]." (*Id.*). This Court must presume the correctness of these factual findings made by the Michigan Court of Appeals. Petitioner has not presented the "clear and convincing" evidence necessary to rebut the presumption of correctness attached to the factual findings. *See* 28 U.S.C. § 2254(e)(1); *see also Cornelius v. Prelesnik*, No. 1:13-cv-992, 2016 WL 5538045, at *7 (W.D. Mich. Sept. 30, 2016). The third factor likewise weighed against petitioner. Petitioner "did not assert his right to a speedy trial. Rather, on the day that trial was finally scheduled

to begin, he attempted to further delay trial by requesting to represent himself." (Op. at 7, PageID.1167). The Michigan Court of Appeals rejected petitioner's claims that he had suffered prejudice stemming from the delay. It did not find persuasive petitioner's claim that three witnesses from Alabama that he intended to call as a witness (Rosalyn King, Sterling Anderson, and Willie Floyd) "could no longer afford to travel from Alabama to testify on his behalf" because they "had previously traveled to Michigan from Alabama on numerous occasions, only to have the trial adjourned." (*Id.*). Petitioner " fail[ed] to acknowledge [] that trial was previously adjourned either at his request or because of his attorney's motion to withdraw. Moreover, the absence of these witnesses did not deny [petitioner] his ability to present a defense as he claims. If they would have testified as he asserts in his Standard 4 brief, their testimony would have primarily been corroborative of defendant's testimony. Accordingly, defendant was not denied his constitutional rights to a speedy trial." (*Id.*).

The Court finds that the decision of the Michigan Court of Appeals rejecting Ground IV withstands scrutiny under 28 U.S.C. § 2254(d).

## V.   Claims of Ineffective Assistance of Trial Counsel

In Ground V, petitioner argues that his trial counsel was constitutionally ineffective on numerous grounds. (Amended Petition, ECF No. 5, PageID.85-92; Petitioner's Brief at 15-22, ECF No. 2, PageID.27-34; Reply Brief at 27-38, ECF No. 15, PageID.1951-62).

-34-

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. Petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687-88. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  On the prejudice prong, "[petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Michigan Court of Appeals applied the *Stirckland*  standard and rejected all petitioner's claims of ineffective assistance of trial counsel.  (Op. at 7-9, ECF No. 11-24, PageID.1167-69).  The Court of Appeals found no merit in petitioner's argument that his attorney had been ineffective for failure to subpoena Rosalyn King, Sterling Anderson, and Willie Floyd to testify at trial.  Again, assuming that these witnesses would have testified in accordance with petitioner's assertions in his Standard 4 brief, "their testimony would not have provided a substantial defense. Moreover, because the record is silent regarding what these witnesses would have

testified, defendant cannot establish a reasonable probability that the outcome would have been different had these witnesses testified." (*Id.* at 8, PageID.1168).

The Michigan Court of Appeals rejected petitioner's arguments that his attorney had been ineffective for failure to file pretrial motions, object to a 911 recording, object to the prosecutor's use of phone records, cross-examine witnesses, object to the trial court's ruling regarding jury review of AP's transcribed testimony, and investigate petitioner's criminal record and advocate for a lesser habitual offender supplement.  Petitioner's arguments that  counsel failed to file pretrial motions for discovery of drug test results and criminal records regarding prosecution witnesses and for an evidentiary hearing regarding the prosecutor's biological evidence were meritless.  "Absent some indication of what the discovery would have revealed and what defendant intended to establish at the evidentiary hearing, he has failed to demonstrate a reasonable probability that counsel's alleged errors affected the outcome of the proceeding."  (Op. at 8, PageID.1168).  The record did not support petitioner's claim that his attorney was ineffective for failing to object to the introduction of a 911 recording played before the jury.  It did not indicate that counsel was unaware of the existence of the recording before trial.  Further, "because the prosecutor established a proper foundation for the admission of the recording, counsel had no valid reason to object to its admission.  Counsel [was] not required to make futile objections."  (*Id.*).

Petitioner's argument that his attorney was ineffective for failing to object to

the prosecutor's use of cell phone records to impeach petitioner's testimony that he spoke with AP on his cell phone before the offenses occurred was meritless. Petitioner appeared to be "under the misapprehension that the trial court admitted the cell phone records as evidence. To the contrary, defense counsel argued against their admission and the court denied the prosecutor's request to admit the cell phone records." (*Id.*). The record did not support petitioner's assertion that defense counsel moved to strike the records from evidence after the jurors began deliberations. "Because the records were never admitted, there existed nothing to strike. Although the trial court did not instruct the jurors to disregard the limited testimony concerning the records, considering the overwhelming evidence against defendant, any error in this regard was harmless. Defendant has not demonstrated a reasonable probability that counsel's actions affected the result of the proceeding." (*Id.*).

The record did not support petitioner's argument that his attorney was ineffective for failing to cross-examine Ms. Belcher and Mr. Scoggins regarding alleged inconsistencies among their written statements to the police, preliminary examination testimony, and trial testimony. Counsel's cross-examination of these witnesses was not deficient. (*Id.* at 8-9, PageID.1168-69).

Petitioner's argument that counsel was ineffective for failing to object when the trial court foreclosed the possibility of the jury reviewing AP's transcribed

testimony[9] was based on petitioner's misrepresentation of the underlying record:

> The record does not support defendant's characterization of the trial court's comments.  The court did not foreclose the possibility of the jury reviewing AP's testimony, but rather, stated that a transcript would not be available until the next day or the following Monday.  The court asked that, in the meantime, the jurors rely on their collective memory of the testimony.  Accordingly, the trial court did not foreclose the possibility that the jury could review AP's transcribed testimony.  Further, the record does not support defendant's contention that the trial court stated to the jury, "I want a verdict today."  Defendant's claim is without merit.

(Op. at 9, PageID.1169) (citation omitted).

The Michigan Court of Appeals rejected petitioner's claim that his attorney was ineffective during sentencing by failing to investigate his criminal record and advocate for a lesser habitual offender supplement.  The record did not support petitioner's belated claim that he did not commit many of the offenses listed in his PSIR.  In addition, the record showed that counsel "attempted to discuss the PSIR with [petitioner] before sentencing, but [petitioner] refused to communicate with counsel. The trial court offered to adjourn the sentencing hearing until later in the morning to give [petitoner] a chance to further discuss the PSIR with counsel, but [petitioner] stated, 'It's don't [sic] matter, your Honor.  We can just proceed.' " (Op. at 9, PageID.1169).  Petitioner was given an opportunity to review the PSIR with counsel before he was sentenced.  Petitioner failed to demonstrate any prejudice

---

[9]The Court of Appeals noted that the record did not support petitioner's assertion that the jury also requested to review Ms. Belcher's testimony.  (*Id.* at 9 n.3, PageID.1169).

attributable to his attorney's conduct.  (*Id.*).

Because the Michigan Court of Appeals rejected petitioner's claims of ineffective assistance of trial counsel on the merits, its decision on each claim must be afforded deference under AEDPA.  *See Burt v. Titlow*, 134 S. Ct. at 15-18; *Harrington v. Richter*, 562 U.S. at 98-101.  To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington.  See Bell v. Cone*, 535 U.S. at 698-99.

Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decisions applied *Strickland* incorrectly. Rather, petitioner must show that the state courts "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012).  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013).  "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Woods v. Donald*, 135 S. Ct. at 1376; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

-39-

The question before the habeas court, then, is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Premo v. Moore*, 562 U.S. at 123; *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015). Petitioner must show that the state court's ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. at 103).

Petitioner does not approach satisfying this demanding standard. None of the claims asserted in Ground V provide a basis for federal habeas corpus relief. *See* 28 U.S.C. § 2254(d)(1).

## VI. Sufficiency of the Evidence to Support Petitioner's Kidnapping Conviction

In Ground VI, petitioner argues that the evidence at trial was insufficient to support the jury's verdict finding him guilty of kidnapping. (Amended Petition, ECF No. 5, PageID.93-94; Petitioner's Brief at 23-24, ECF No. 2, PageID.35-36; Reply Brief at 39-42, ECF No. 15, PageID.1963-66).

A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.*; *see Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*) ( *Jackson v. Virginia* "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial."). Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n. 16; *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

The Michigan Court of Appeals ruled directly on this claim. Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). Such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia*. *See Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015). Review "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her

favor." *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007).  This standard

presents a "nearly insurmountable hurdle" for the habeas petitioner.  *Davis v. Lafler*,

658 F.3d at 534. "Adding to this extremely high bar are the stringent and limiting

standards of AEDPA."  *Id.*

The Sixth Circuit has summarized the "double layer of deference" given the

state-court decisions in the context of sufficiency-of-the-evidence claims:

> First, as in all sufficiency-of-the-evidence challenges, we must
> determine whether, viewing the trial testimony and exhibits in the light
> most favorable to the prosecution, any rational trier of fact could have
> found the essential elements of the crime beyond a reasonable doubt.
> See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d
> 560 (1979).  In doing so, we do not re-weigh the evidence, re-evaluate
> the credibility of witnesses, or substitute our judgment for that of the
> jury.  *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).
> Thus, even though we might have not voted to convict a defendant had
> we participated in jury deliberations, we must uphold the jury verdict if
> any rational trier of fact could have found the defendant guilty after
> resolving all disputes in favor of the prosecution.  Second, even were we
> to conclude that a rational trier of fact could not have found a petitioner
> guilty beyond a reasonable doubt, on habeas review, we must still defer
> to the state appellate court's sufficiency determination as long as it is
> not unreasonable.

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.2009).

The Michigan Court of Appeals articulated the appropriate standard under

*Jackson v. Virginia*, citing state cases adopting this standard.  The Court of Appeals

found that the evidence was sufficient to support the jury's verdict.  The elements of

kidnapping are:  "(1) a forcible confinement of another within the state, (2) done

wilfully, maliciously and without lawful authority, (3) against the will of the person

confined or imprisoned, and (4) an asportation of the victim which is not merely incidental to an underlying crime unless the crime involves murder, extortion or taking a hostage." (Op. at 9-10, PageID.1169-70). The Court of Appeals rejected petitioner's argument that the evidence was insufficient to establish confinement and asportation. Ms. Belcher testified that petitioner "forced himself into her home when she answered his knock at the door. He then shut the door and began striking her in the head with a hammer. While she attempted to grab the hammer out of [petitioner's] grasp, they 'scuffled' through the kitchen and the living room and ended up in a bedroom. Thereafter, defendant barricaded the bedroom door with a dresser and confined Belcher in the bedroom for over an hour. She testified that she never felt free to leave, but she managed to flee out the front door when [petitioner] appeared to be asleep on the couch. Further, movement of a victim incidental to an underlying crime involving taking a hostage is sufficient asportation to support a kidnapping conviction. [*People v.*] *Wesley*, [365 N.W.2d 292, 296 (Mich. 1984)]. Here, [petitioner] relayed to police serious physical threats against Belcher should they attempt to enter Belcher's home. [Petitioner's] movement of Belcher inside the home was incidental to taking a hostage, and thus asportation sufficient to support the kidnapping conviction exists." (*Id.*).

The decision of the Michigan Court of Appeals upholding the sufficiency of the evidence to support the kidnapping conviction was not an unreasonable application of the *Jackson v. Virginia* standard. Ground VI must be rejected.

-43-

## VII.   Claims of Ineffective Assistance of Appellate Counsel

In Ground VII, petitioner argues that his appellate counsel was constitutionally ineffective for failure to raise the issues that petitioner raised in his motion for relief from judgment.  (Amended Petition, ECF No. 5, PageID.95-96; Petitioner's Brief at 25-26, ECF No. 2, PageID.37-38; Reply Brief at 43-45, ECF No. 15, PageID.1967-69).

Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland*.  *See Evitts v. Lucey*, 469 U.S. 387 (1985).  In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal.  *Jones v. Barnes*, 463 U.S. 745, 754 (1983).  Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal. *See  Smith v. Murray*, 477 U.S. 527, 536 (1986).  Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel.  *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  " 'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy."  *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52).  Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  To overcome the presumption of competence of appellate counsel in these circumstances,

-44-

a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert.  *Id.*; *see Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012) (Petitioner "must show the issues his appellate counsel failed to raise were 'clearly stronger' than the issues his counsel did raise – and that the state court lacked a reasonable basis for believing otherwise.").  Appellate counsel has no duty to raise meritless issues.  *Evitts*, 469 U.S. at 394; *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and petitioner "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Consequently, counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal."  *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005).

Because the trial court decided petitioner's claims of ineffective assistance of appellate counsel on their merits, its decision must be afforded the doubly deferential judicial review as previously indicated in the discussion of Ground V.  Judge Maceroni rejected petitioner's arguments claiming ineffective assistance of appellate counsel.  The issues petitioner raised in his motion for post-conviction relief were meritless.  They  were not clearly stronger than the issues raised by appellate

counsel and there is not a reasonable probability that inclusion of those issues would have changed the result of the appeal.  (Op. at 9, ECF No. 11-18, PageID.1135).

The court finds that the state court decision rejecting petitioner's claims of ineffective assistance of appellate counsel withstands scrutiny under the doubly-deferential standard of review.  *See* 28 U.S.C. § 2254(d)(1).

## VIII.  Sufficiency of the Evidence Supporting Petitioner's Conviction for Breaking and Entering a Building

Ground VIII is petitioner's argument that the evidence at trial was insufficient to support the jury's verdict finding him guilty of breaking and entering a building.  (Amended Petition, ECF No. 5, PageID.97-100; Petitioner's Brief at 27-30, ECF No. 2, PageID.39-42).

Judge Maceroni rejected petitioner's claim that there was insufficient evidence of breaking to support the challenged breaking and entering conviction.  Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support the jury's verdict.  "In Michigan any amount of force used to open a door or a window to enter a building, no matter how slight, is sufficient to constitute the breaking."  (Op. at 5-6, ECF No. 11-18, PageID.1131-32) (quoting *People v. Wise*, 351 N.W.2d 255, 259 (Mich. Ct. App. 1984)).  Petitioner had to open a door to enter the building and that was sufficient to establish the breaking element.  (Op. at 5-6, PageID.1131-32).

The doubly-deferential standard of review discussed in connection with

Ground VI applies to the state court decision rejecting petitioner's argument that the evidence at trial was insufficient to support the breaking element of breaking and entering a building.  The trial court's decision rejecting Ground VIII easily withstands scrutiny under the double layers of deference to which it is entitled under AEDPA.

## IX.   Restraints

In Ground IX, petitioner argues that the trial court judge violated his rights under the due process clause by requiring petitioner to appear in shackles at trial, and alternatively that trial counsel was ineffective for failure to object.  (Amended Petition, ECF No. 5, PageID.101-03; Petitioner's Brief at 31-33, ECF No. 2, PageID.43-45; Reply Brief at 46-50, PageID.1970-74).

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court addressed whether the routine use of shackles during the sentencing phase of a death penalty case violated the Due Process Clause.  Before reaching that question, the Supreme Court for the first time expressly held that routine shackling of a defendant during the guilt phase of a trial violates the Due Process Clause, "unless that use is justified by an essential state interest – such as the interest in courtroom security – specific to the defendant on trial."  544 U.S. at 624.  The Court stated that the law has "long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."  *Id.* at 626.  The Supreme Court reasoned that its prior statements "gave voice to a principle deeply

embedded in the law":

> We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution.  Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

Id. at 629.

Judge Maceroni found no merit in petitioner's argument that his due process rights had been violated or that counsel was ineffective for failure to raise this meritless issue.  (Op. at 7-9, ECF No. 11-18, PageID.1133).  It is patent that the use of ankle restraints was justified.  Petitioner had been convicted three times of escape from prison.  In addition, after being arrested on thirteen felony charges, petitioner was charged with four additional counts of criminal sexual conduct for incidents while he was incarcerated in the Macomb County Jail.  (Id.).

Further, the state court found that petitioner's leg restraints "were not visible to the jury." (Id. at  at 7-8, PageID.1133-34).  This is fatal to petitioner's claim. "Deck's facts and holding [ ] concerned only visible restraints at trial.  The Supreme Court was careful to repeat this limitation throughout its opinion." Mendoza v. Berghuis, 544 F.3d 650, 654 (6th Cir. 2008).  "[T]he clearly established precedent on which [petitioner] relies – namely Deck – is limited to cases where the defendant's shackles are 'visible to the jury.' " Mendoza, 544 F.3d at 655 (quoting Deck, 544 U.S. at 629).

-48-

Finally, even if petitioner had shown that his shackling violated the Due Process Clause, any error was harmless.  On habeas review, harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), not under the *Chapman v. California*, 386 U.S. 18, 24 (1967) standard.  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." 551 U.S. at 121-22 (citations omitted); *see Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015); *see also Kelly v. McKee*, No. 16-1572, __ F.3d __, 2017 WL 395975, at *8 (6th Cir. Jan. 24, 2017).

The Court finds that any constitutional error in shackling petitioner during trial did not have a substantial and injurious effect on the jury's verdict.  The evidence of petitioner's guilt was overwhelming.  *See, e.g., Keys v. Booker*, 798 F.3d 442, 454 (6th Cir. 2015); *Cole v. Tribley*, No. 12-14826, 2015 WL 471388, at *10 (E.D. Mich. Feb. 4, 2015).  Accordingly, even if constitutional error had occurred, it was harmless.

Petitioner has not shown that the state court's decision rejecting Ground IX was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

## X.    Jury Request to Review Transcript

In Ground X, petitioner argues that the trial court judge violated his due process rights by denying a jury request to review testimony.  (Amended Petition, ECF No. 5, PageID.104-07; Petitioner's Brief at 34-37, ECF No. 2, PageID.46-49).

Ground X is based on petitioner's mischaracterization of the record.  He has presented nothing approaching the clear and convincing evidence necessary to overcome the presumption of correctness that applies to the factual findings of the Michigan Court of Appeals.  28 U.S.C. § 2254(e)(1).  The Court of Appeals found that the trial court judge "did not foreclose the possibility of the jury reviewing AP's testimony, but rather, stated that a transcript would not be available until the next day or the following Monday.  The court asked that, in the meantime, the jurors rely on their collective memory of the testimony."  (Op. at 9, ECF No. 11-24, PageID.1169).  "The trial court did not foreclose the possibility that the jury could review AP's transcribed testimony."  (*Id.*).  The decision of the Michigan Court of Appeals rejecting Ground X easily withstands scrutiny under 28 U.S.C. § 2254(d).

## XI.   Phone Records

In Ground XI, petitioner argues that he was denied a fair trial when phone records was introduced into evidence without a proper foundation in violation of Rule 901 of the Michigan Rules of Evidence.  (Amended Petition, ECF No. 5,

-50-

PageID.108-14; Petitioner's Brief at 38-43, ECF No. 2, PageID.50-55).

A federal habeas court may only grant relief if a defendant is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The adequacy of the foundation for the admission of evidence is governed by the state evidence rules, not the federal Constitution. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007). The adequacy of a foundation for admitting evidence under Michigan's court rules is not reviewable in a habeas corpus proceeding. *See, e.g.*, *Howell v. Romanowski*, No. 13-cv-13344, 2014 WL 1882771, at *6 (E.D. Mich. May 12, 2014); *Rhea v. Jones*, 622 F. Supp.2d 562,  589 (W.D. Mich. 2008).

Ground XI does not provide a basis for federal habeas corpus relief.

## XII.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S.

473 (2000). *Murphy*, 263 F.3d at 467.  Consequently, the Court has examined each of petitioner's claims under the *Slack* standard.

Petitioner cannot demonstrate that reasonable jurists would find that the denial of habeas corpus relief on each of the grounds raised in his petition is debatable or wrong.  *See Slack*, 529 U.S. at 484.  Accordingly, the Court will enter an order denying petitioner a certificate of appealability.

## Conclusion

For the foregoing reasons, the habeas corpus petition will be denied.

Dated:  February 14, 2017       /s/ Paul L. Maloney
                Paul L. Maloney
                United States District Judge